STATE of Wisconsin,
Plaintiff-Respondent-Petitioner,

v.

Tony PAYANO,
Defendant-Appellant.†

Supreme Court

*No. 2007AP1042–CR. Oral argument December 9, 2008.
—Decided July 21, 2009.*

2009 WI 86

(Also reported in 768 N.W.2d 832.)

† Motion for reconsideration denied 12/21/09.

For the plaintiff-respondent-petitioners the cause was argued by *Sarah K. Larson,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

For the defendant-appellant there was a brief by *Patrick Cavanaugh Brennan* and *von Briesen & Roper, S.C.,* Milwaukee, and oral argument by *Patrick Cavanaugh Brennan.*

¶ 1. DAVID T. PROSSER, J. This is a review of a published decision of the court of appeals, *State v. Payano,* 2008 WI App 74, 312 Wis. 2d 224, 752 N.W.2d 378, reversing Tony Payano's (Payano) convictions for one count of second-degree reckless injury while using a dangerous weapon, contrary to Wis. Stat. §§ 940.23(2)(a) and 939.63 (2007–08),[1] and two counts of second-degree recklessly endangering safety while using a dangerous weapon, contrary to Wis. Stat. §§ 941.30(2) and 939.63. Payano was convicted by a jury in Milwaukee County Circuit Court, with Judge Karen E. Christenson presiding.

¶ 2. The State poses two issues for review:

(1) Under *State v. Sullivan,* 216 Wis. 2d 768, 576 N.W.2d 30 (1998), is "other acts" evidence admissible for the purposes of providing context and rebutting the defendant's self-defense claim, when the evidence was relevant to why police were at the defendant's door, and when the evidence was also relevant to what the defendant knew at that time?[2]

(2) Under *Sullivan's* independent review doctrine, did the court of appeals independently search the record for other bases to sustain the circuit court's discretionary decision to admit the evidence?

---

[1] All subsequent references to the Wisconsin Statutes are to the 2007–08 version unless otherwise indicated.

[2] This question ultimately implicates an evaluation of relevance under Wis. Stat. § 904.01 and unfair prejudice under Wis. Stat. § 904.03.

¶ 3. After carefully considering the facts and circumstances, we conclude that the circuit court did not err in admitting the "other acts" testimony of a confidential informant about his observations of the defendant's possession of drugs and a handgun in the defendant's apartment on the day before the police executed a no-knock search warrant at the apartment. The informant's testimony provided context for an incident in which a police officer was shot by the defendant. It explained why the police were at the defendant's apartment, and it provided a plausible explanation of why the defendant fired his gun at a police officer trying to enter the apartment. The informant's testimony served to rebut the defendant's claim that he was acting reasonably in defense of himself and his family. It provided a motive for the shooting.

¶ 4. The circuit court determined that (1) evidence of the defendant's very recent involvement with drugs and a gun at the place where the shooting occurred was offered for a proper purpose under Wis. Stat. § 904.04(2); (2) the evidence was relevant under Wis. Stat. § 904.01; and (3) the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Wis. Stat. § 904.03. The circuit court did not erroneously exercise its discretion because it reviewed the relevant facts, applied a proper standard of law, and using a rational process, reached a reasonable conclusion. We believe the circuit court offered a cogent explanation for admitting the evidence in the circumstances presented.

¶ 5. Because of our decision on the first issue posed by the State, we find it unnecessary to address the second issue.

¶ 6. Accordingly, we reverse the decision of the court of appeals.

354

## I. BACKGROUND AND PROCEDURAL HISTORY[3]

¶ 7. This case involves the shooting of a Milwaukee police officer during the execution of a no-knock search warrant. Payano does not deny shooting the officer. He asserts that he was acting reasonably in self defense and defense of others. Thus, the facts in this case are critical.

¶ 8. In 2005, Payano, then 19, lived at 905 West Harrison Avenue in Milwaukee. He lived in Apartment No. 4 on the second floor of the building with his mother, Ovidia De Los Santos (Ovidia), his father, and his sister. His uncle, Juan Batista (Juan), and his cousin, Joel Batista (Joel), lived in Apartment No. 2 on the first floor of the building. Payano's appellate counsel describes Payano as "an immigrant from the Dominican Republic with limited English skills."

¶ 9. On the afternoon of October 3, 2005, Payano returned home to 905 West Harrison Avenue with Juan and Joel. He went upstairs to Apartment No. 4 while Juan and Joel remained outside. The family members were situated in these positions when two unmarked Milwaukee police vehicles pulled up to the 905 address to execute a no-knock search warrant for weapons and narcotics in Apartment No. 4. Officer Michael Lutz (Officer Lutz), Officer Jon Osowski (Officer Osowski), and Officer Rick Sandoval (Officer Sandoval) arrived in one unmarked vehicle. Sergeant Michael Hartert (Sergeant Hartert) and Detective Lieutenant Michael Dubis (Lieutenant Dubis) arrived in the other vehicle. Ser-

---

[3] Unless otherwise stated, all facts and testimony referenced in this opinion come from either the parties' briefs to this court or the record from Payano's second trial. We are not aware of any material difference between Payano's testimony at his first trial and his testimony at his second trial.

355

geant Hartert was in full police uniform. Lieutenant Dubis was dressed in a suit and tie with his badge fastened to his belt. The other three officers, including Officer Lutz, were in a "plain clothes capacity," which generally means "jeans, a t-shirt, a full duty complement of guns, ammunition, bulletproof vest, and [the] badge and identification hanging around [the] neck."

¶ 10. When the police arrived, Joel immediately ran into the building and up the stairs to Apartment No. 4. The officers, not knowing whether Joel was the suspect ("Rico") named in the search warrant, chased after him. The officers proceeded with weapons drawn. They claim that they yelled "Police," "Stop, search warrant," and "Hands up," both on the street and inside the building. They claim that these commands were made in both English and Spanish.

¶ 11. In opposition, Payano claims that either he did not hear or understand the officers' commands. Payano testified that he was in Apartment No. 4 with his mother, Ovidia, when he heard footsteps and screaming outside the door. Joel then rushed into the apartment, and Payano locked the door. According to Payano, Joel expressed fear upon entering the apartment, saying over and over, "It's not me," and "They are confusing me with someone." Payano testified that Joel did not know how to answer his question: "Who is it?"

¶ 12. The officers arrived at Apartment No. 4 and began to break down the door while Joel was attempting to hold it shut. Payano testified that, as events unfolded, Ovidia was crying and screaming hysterically and was unable to comply with Payano's request that she call the police. Payano testified that he was paying attention to the door of the apartment, watching Joel holding the door.

¶ 13. He was asked at trial: "Did you know that the men on the other side of the door were police?" He answered: "I never imagined that."

¶ 14. The questions to Payano continued as follows:

Q. There comes a time that you do something to fend off these men.

A. Yes.

Q. What did you do?

A. After a few seconds when no one answered and the door was breaking on both sides, I ran to get the weapon that I had.

Q. And where was that?

A. Under the sofa.

Q. And then what did you do?

A. I ran, and I got near the door.

Q. And at this point, was there still hitting on the door?

A. Never stopped hitting the door.

Q. Was Joel saying anything?

A. As far as I remember, "They are going to kill us."

Q. And then what did you do?

A. I said, I have no other choice. I have no other solution, and according to the way they were breaking the door like that they were not going to spare us alive.

Q. So what did you do?

A. I fired.

According to Payano, neither he, Joel, nor Ovidia "realized that the men at the door were, in fact, police officers."

¶ 15. Payano's gunshot hit and wounded Officer Lutz. Lutz testified to the following:

A. I proceeded to the door. I announce "Milwaukee police. Milwaukee police." I have my gun in my right hand extended before me, and I have my left hand out to push open the door, and I start pushing open the door as I'm yelling, "Milwaukee Police."

Q. As you're pushing that door with the one hand and holding your weapon in the other hand, what happens next?

A. The door gets open approximately 12 inches. And I'm able to see a refrigerator to my left, and I see Mr. Payano leaning over the refrigerator pointing a gun at me.

Q. What happened then?

A. It happened very quickly. Just as the door was opened and I glanced, I didn't have the time to bring my gun over. I heard one shot fired.

Q. And the shot came from where?

A. Mr. Payano.

Q. Who was partially behind the refrigerator?

A. Yes. He took concealing in front of the refrigerator [sic] and was up over the refrigerator.

358

Q. Over the top of it?

A. Yes.

Q. Was that [a] full height refrigerator or one that wasn't a full?

A. It appeared to be a small or medium size refrigerator. It wasn't a full size larger refrigerator.

Q. So you could see his head over the top of it?

A. Head and shoulders and arms.

Q. Then one shot. Where did it go?

A. I didn't know where it hit initially. I know that I was — I fell backwards and landed on my butt. I was then going to return fire and trying to use a two handed grip, and in the moment when I brought my gun up, I noticed that my left arm wasn't following me. And when I looked behind, I could see it obviously was broken. It was bent back, bent at a very awkward position, and then I noticed I was bleeding.

¶ 16. Officer Lutz suffered severe damage to his left arm. His injuries required three separate surgeries, leaving him with very poor muscle strength in his arm. Officer Lutz was unable to return to active duty because of his injuries.

¶ 17. Payano testified that, after shooting one time in defense of himself and his family, the following transpired:

A. After I fired . . . I heard the gunshots being returned. I fell to the ground because I thought I had been shot several times.

Q. How many gunshots did you hear?

359

A. I heard about five or six.

Q. From the ground then, where did you go?

A. I went to get my mom.

Q. And where was your mom?

A. On the ground screaming nervous without being able to speak.

Q. Did you and Joel and your mom then go to the bathroom?

A. Yes. I instructed them to go to the bathroom because it was . . . the safest area where we could avoid the bullets.

Q. When the three of you got into the bathroom, how were you positioned in the bathroom?

A. Well, first I put my mom in the corner, and then I got in and then Joel because I said if we were standing in front of the door they could shoot.

Q. So you were[,] the three of you[,] in the bathtub?

A. Correct.

Q. Did your mom — [y]ou have the telephone in your hand?

A. Yes.

Q. And did you call 911, Tony?

A. Yes.

. . . .

360

(Cassette tape played.)[4]

. . . .

Q. Mr. Payano, was that you who called 911 and was that you on the recording we just heard?

A. Yes.

Q. At some point after you call, you left the bathroom?

A. Yes.

Q. Why did you leave the bathroom?

A. Because they knocked on the door and said, "Police."

Q. And before you left the bathroom, did you put the gun in the toilet tank?

A. Yes.

Q. Why did you do that?

A. Because the police arrived, and I [knew I had fired the weapon].

¶ 18. After the shooting had ceased and the police were able to secure the premises, Payano, Joel, and Ovidia were each arrested. The police found no evidence of drugs, drug use, or drug sales in the apartment; they did locate the handgun Payano used in the shooting, which had been placed in the tank of the bathroom toilet. No injuries other than Lutz's injury were reported.

¶ 19. Joel was "soaking wet" when he was arrested. At trial, he testified, explaining his condition:

---

[4] Neither the 911 recording nor a transcript of the call are included in the record.

Q. How did you get wet?

A. When I heard that they were banging on the door I heard [Ovidia] calling me . . . she said come over here to the bathroom, to the bathroom. We went into the bathroom, when I got into the bathroom and I fell and I hit the faucet.

Q. How did you fall exactly?

A. I fell and I hit it with my elbow like that and the shower started going.

Q. What were you doing when you fell?

A. I fell and the water fell on top of me.

Q. What exactly were you doing when you lost your balance and fell?

A. I was—we were running towards the bathroom.

Q. Whose idea was it to go into the bathroom?

A. When [Ovidia] said let's go into my room, [Payano] said no, so we went over to the bathroom.

 . . . .

Q. You accidentally turned on the faucet when you fell?

A. Yes.

Q. That is how you got wet?

A. Yes.

 . . . .

Q. Were you the only one in the tub when that happened?

A. No.

362

Q. Who else was in the tub when this happened?

A. The three of us.

Q. But you were the one that got wet?

A. I think [Payano] got wet also and [Ovidia] got wet a little bit too but I was looking forward.

. . . .

Q. Was anybody flushing the toilet when you ran into the bathroom?

A. No.

Q. Were any of the faucets already on when you ran into the bathroom?

. . . .

A. No.

Q. Anybody flushing drugs when you ran into the bathroom?

A. What drugs, we didn't have any.

Q. Did you flush any drugs when you ran into the bathroom?

A. No, I have never dealt with drugs.

¶ 20. Payano was charged with three offenses: one count of first-degree reckless injury while armed, a Class D Felony, in violation of Wis. Stat. §§ 940.23(1)(a) and 939.63, and two counts of first-degree recklessly endangering safety while armed, a Class F Felony, in violation of Wis. Stat. §§ 941.30(1) and 939.63.

¶ 21. Payano's first trial began on February 13, 2006, and lasted through February 20. Payano never denied shooting and injuring Officer Lutz. Instead, he

363

asserted an affirmative defense, arguing that his shooting was motivated by self-defense and the defense of others, specifically Joel and Ovidia. Payano's counsel summarized the issue to the circuit court during the final pre-trial proceedings before Payano's first trial:

> I think essentially this [comes] down to a factual issue, the factual issue being whether at the time the nonuniform police officers were in the process of breaking down the door to the apartment where the Defendant was located, they did or did not properly and adequately announce themselves as police officers such that when he fired the shot, he knew their identity or whether he reasonably believed that they were, as [Joel] advised him, unknown persons wielding guns threatening to kill him. I believe in sum and substance, that is the essence of the case.

¶ 22. Ultimately, the outcome of the trial turned on whether the jury believed Payano's version of the story—that he was acting in self-defense and the defense of others—or whether it believed the prosecution's version—that Payano fired the gun to "buy" extra time so he could flush any evidence of drugs, which according to the search warrant were believed to be present in the apartment.

¶ 23. The jury deliberated from 1:00–5:20 p.m. on Friday, February 17, 2006, and it returned on Monday morning, February 20, at 8:30 a.m. At 1:20 p.m., the jury informed the circuit court that it was unable to reach a unanimous verdict on any of the charges. Judge Christenson declared a mistrial and adjourned the matter for further future proceedings.

¶ 24. In June 2006, Payano was retried for the same three offenses in a jury trial with Judge Christenson presiding. Although there was no newly discovered evidence, the prosecution changed its trial strategy and

asked that the circuit court admit other acts evidence that it had not used in the first prosecution. Specifically, the prosecution asked the court to admit into evidence the testimony of a confidential informant, Jason Kojis (Kojis), and the information he provided to Officer Lutz that was the basis for the no-knock search warrant.

¶ 25. On June 20, 2006, after the jury was impaneled but before opening statements, the court conducted a *Sullivan*[5] hearing in chambers to determine whether the other acts evidence proffered by the prosecution should be admitted, and if so, for what purpose.

¶ 26. In making its offer of proof, the prosecution revealed a lot about Kojis. First, the prosecution noted that Kojis was a convicted criminal who had "a working relationship" with Officer Lutz and that he had provided Officer Lutz with information in exchange for money on several past occasions. The prosecution then questioned Kojis in detail about what he had reportedly witnessed on October 2, 2005, the day before the shooting incident at 905 West Harrison Avenue.

¶ 27. Kojis explained that his presence in Apartment No. 4 was not drug related. He had gone to the apartment with a friend who was involved in a personal dispute. Kojis was asked the following:

Q. Do you remember which apartment?

A. Yes.

Q. Okay. Which apartment?

A. I don't know the exact number, but I know like if you go up the stairs.

Q. Okay. And you described which apartment when

---

[5] *State v. Sullivan,* 216 Wis. 2d 768, 576 N.W.2d 30 (1998).

you later talked to Officer Lutz?

A. Yes.

Q. When you got into that apartment who, if anyone, was present in the apartment?

A. Mr. Payano.

Q. Okay. And have you identified Mr. Payano in some formal way for the Milwaukee Police Department?

A. Yes.

Q. And did you do that by a photo lineup?

A. Today, yes.

Q. Okay. And in terms of the photo lineup, that was just done this morning?

A. Yes.

Q. Is the person that you've referenced as Tony Payano, did you know his name back in October?

A. Not as Tony Payano.

Q. And is that person that you've referenced as Tony Payano present in the Chambers here today?

A. Yes.

¶ 28. Kojis said he saw Payano in the kitchen of the apartment:

Q. What, if anything, did you notice that was in the kitchen?

A. Mounds of dope packaged up and a handgun.

366

Q. Dope?

A. Cocaine. And a handgun.

Q. And you could tell it was cocaine?

A. Yeah. Well, anybody that's been on the streets can look and see what it is.

Q. Approximately what kind of amount did you think you saw in the residence at that time?

A. Numerous—numerous small packages and one big chunk.

. . . .

Q. Did you have any estimate as to how much total you saw on the kitchen table?

A. From my experience on the streets, I'd say anywhere from like two to three, maybe more than that. At least two to three ounces.

. . . .

Q. Did Mr. Payano and you speak at all between the two of you?

A. No. He spoke to the friend that I had went with.

Q. Did you get a good look at the gun that was on the table?

A. Yes.

Q. Did you notice anything about the gun, I mean what type of gun it was?

A. I knew it was a small caliber. I assumed it was a 380 because I seen it and I know my sizes. And I

described it to Officer Lutz when I called him to tell him about it the next day.

. . . .

Q. About how long total were you in Mr. Payano's kitchen that morning or that afternoon?

A. I'd say about maybe like five to ten minutes, give or take.

. . . .

Q. And how long did you wait before you let Officer Lutz know what you had seen at 905 West Harrison?

A. The next morning.

. . . .

Q. What's the next relevant thing that happened or that you observed on that Monday, October 3, the same day you gave the information to Officer Lutz?

A. Well, that morning we . . . rode by there and I pointed the suspect out. And then I went—

Q. Who did you point him out to?

A. Officer Lutz and the partner that was with him at the time.

Q. And you did that so Officer Lutz would know who you were talking about?

A. Exactly.

Q. And who did you point out to Officer Lutz on the morning of Monday, October 3[]?

A. Mr. Payano.

Q. And where was he when you pointed him out to
 Officer Lutz?

A. Standing next to the house.

After answering questions from the prosecution, the
defense, and the court, Kojis was dismissed from cham-
bers.

¶ 29. The prosecution then set forth its justifica-
tion for the admission of Kojis's testimony and the
information he provided to Officer Lutz:

> Judge, I guess the most succinct way I can put this
> is . . . *it goes directly to the defense in this case.* If this
> were a situation where Mr. Payano's defense was ["]I
> wasn't the shooter, I never fired a shot, I did not commit
> this crime,["] then I would not be offering this. It would
> be improper other acts and it would be very clear.
>
> What makes it different is that the defense in this
> case is that he fired the shot through the door, that he
> did so because he had a lack of knowledge that it was the
> police. He says he did not ever hear them identify
> themselves as police, ever see any uniform, ever see any
> badge, ever hear any yelling about search warrants. And
> that is a factual dispute that the jury has to sort out.
>
> . . . [I]n this case the Court has an unusually clear
> picture of exactly where this fits in because we've done
> the trial once. And the court will recall that, not only
> was it the privilege of self-defense that was the defense
> in this case, but also that the defense used the lack of
> any drugs as one of its primary weapons to defeat the
> case, that and the 911 tape. So you have a situation
> where the person is claiming reasonable self-defense.
> And that instruction of course hinges on objective
> reasonableness and the lack of any drugs.
>
> In fact, Mr. Brennan [Payano's first trial counsel]
> did a very aggressive and effective job of pointing out

that in this case, if any, they took every step possible to find any residue, talked to them about the tests to find residue [of drugs] and all this stuff. And very effectively pointed out that no drugs were recovered.

*The fact that on the day before the entry occurred Mr. Payano was seen packaging drugs with the same 380 on the kitchen table in his own kitchen is not being offered to show that he is "a drug dealer"* and, therefore, should be found guilty. *It is strictly being offered to rebut the defense of reasonable self-defense, defense of others.*

. . . .

And *it is specifically statutorily an exception to* [Wis. Stat. §] *904.04 to rebut a defense.* The defense has made it an issue. And that's why it should be admitted. *It's not unduly prejudicial because it focuses on the defense.* And the limiting instruction — in this case the limiting instruction will be much more effective than it is in so many "other acts" cases because that instruction can be written to direct the jury's attention that this evidence is only to be construed when weighing the defense of self-defense.

And . . . we can limit it and reduce greatly any possibility or risk of unfairness by emphasizing to the jury that the only reason that the evidence was admitted and the only relevance of Mr. Kojis'[s] testimony is when you weigh self-defense. And it can be limited to that purpose. And we can greatly minimize any risk of undue influence. *But it is as relevant as any evidence I can imagine to rebut self-defense.*

(Emphasis added.)

¶ 30. Following this offer of proof, Payano's defense counsel, Heather Pantoga, voiced her vigorous objection to the admission of Kojis's testimony or any reference to the information he provided Officer Lutz. Specifically, Payano's defense counsel argued that the

370

evidence was "wholly irrelevant" because it "doesn't have anything to do with this defense which is what was Tony Payano's . . . state of mind when he fired that shot." Defense counsel continued as follows:

> Now, in order to claim—and I think even this is a stretch—but to claim that it goes to the theory of defense is to make a presumption about some archetype of drug dealers and how they behave. There's no foundation for that. It's improper.
>
> And, further . . . Mr. Kojis testified he saw drugs on the table. . . . [H]e testified there was no drug dealing. Nobody bought drugs that day. He didn't buy drugs. His friend didn't buy drugs. There w[ere] drugs on the table. He did testify that Tony Payano was touching those drugs. Nobody else was touching those drugs. He didn't hear any conversation revolving around drugs. It's irrelevant.
>
> And even if this Court decided that it were relevant, although I think it is not relevant, it is evidence of other acts.
>
> And it's highly prejudicial. If the State wants to bring Tony Payano in and paint him as a drug dealer in the backdoor way, they should have charged him with possession or distribution of drugs in the first place and had [Mr. Kojis] testify in that trial. This is not about that.

¶ 31. After listening to the arguments, Judge Christenson explained why she would allow the prosecution to submit Kojis's testimony and the information he provided Officer Lutz as evidence. Judge Christenson said the following:

> It is not about Mr. Payano's being a drug dealer. But having listened to the testimony in the last case, the jury clearly was left with the impression because of pretrial rulings and because of agreements between attorneys . . . .

371

The jury, I believe, was left with the impression that this search warrant was somehow arbitrary, based on nothing, that the police came storming into a place with no basis really for doing that, that it may have been somehow a violation of Mr. Payano's rights, that Mr. Payano was a sometime beautician or hair cutter, that his English was not good, and that he had no reason to expect the police to be coming. *And in that context, I think self-defense is framed somewhat differently.*

Self-defense is, as defined in [Wis. Stat. §] 939.48, a person who is privileged to intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person. And by extension, it goes to the protection of others.

*The jury clearly has to be able to deal with what is reasonable under those circumstances for a reasonable person. I think that the testimony from Mr. Kojis, which clearly places into context what the police were doing there and what Mr. Payano was observed with on the day before, helps the jury to assess reasonability.* It does provide, I think, a somewhat different understanding for the jury about what was going on.

*It does not obviously give the jury the answer about what was in Mr. Payano's mind or what he understood.* Those issues are still for them to deal with.

*The State will not be allowed to suggest that Mr. Payano is a drug dealer.* I think Mr. Kojis should clearly testify that he didn't go there looking for drugs, that neither he nor his friend bought drugs, that there was no drug transaction going on. *But I think it is testimony that places into context the entire situation. And I think it is important to the jury to be able to struggle with what Mr. Payano reasonably believed at the time the search warrant was executed.*

372

¶ 32. Attorney Pantoga sought to persuade the court that it should exclude all evidence of drugs from either side. Assistant District Attorney Thomas L. Potter replied as follows:

> [T]he major issue in this case[ ] is why did Tony Payano fire the shot? Did he fire the shot through the door because he was innocent, had no clue at all that this was the police executing the search warrant and was merely trying to protect his mother in the middle of the day from armed thugs with sledgehammers who are trying to break down his door in the middle of the day? That's the defense version.
>
> The State's version is no, no. He needed to buy a few minutes of time to flush the drugs. And the jury has to pick between those competing motivations for firing the shot.

¶ 33. The court responded with the following:

> I do think that the context and the testimony of this witness is something that the jury should hear for a very narrow point. And I certainly will instruct the jury that they are to consider this only on the issue of whether or not Mr. Payano reasonably believed that it was armed thugs that were attacking his door.

With that explanation, the court permitted the State to use Kojis's testimony and the information he provided Officer Lutz as evidence against Payano.

¶ 34. Kojis's testimony and the information he provided Officer Lutz were both referenced multiple times during Payano's second trial, but there is no indication that the evidence was used for any purpose outside the narrow scope defined by the circuit court.[6]

---

[6] According to our review of the record, it does not appear that the circuit court issued a cautionary instruction as it said

*See Payano,* 312 Wis. 2d 224, ¶¶ 31, 35. After evaluating the evidence and receiving instructions, the jury returned a guilty verdict against Payano on all three counts after about eight hours of deliberations. The court sentenced Payano to 12 years and 6 months of initial confinement and 5 years of extended supervision on the count of second-degree reckless injury while armed and two concurrent terms of 3 years confinement and 2 years of extended supervision on the two counts of second-degree recklessly endangering safety while armed. The sentences on counts two and three were made concurrent to the sentence in count one.

¶ 35. Payano appealed his convictions to the court of appeals, arguing that the circuit court erroneously exercised its discretion by admitting Kojis's testimony and the information he provided to Officer Lutz. *See Payano,* 312 Wis. 2d 224, ¶ 1. He also asserted that such error was not harmless. *See id.* Following the three-step analysis set forth in *Sullivan,* 216 Wis. 2d at 772–73, a unanimous court of appeals agreed with Payano. It reversed his convictions and remanded the matter for a new trial. *Payano,* 312 Wis. 2d 224, ¶ 1. The court of appeals held the following: (1) the other acts evidence offered by the prosecution was not relevant evidence as defined by Wis. Stat. § 904.01, *id.,* ¶¶ 23–25, and (2) in the alternative, the other acts evidence offered by the prosecution presented a "danger of unfair prejudice [that] outweighed [its] probative value," *id.,* ¶¶ 26, 28, 31–32.[7]

---

it would; however, neither party formally requested such an instruction. *See infra,* ¶ 102 n.24.

[7] The court of appeals agreed with the State's assertion that the other acts evidence was offered for a proper purpose under Wis. Stat. § 904.04(2) when it argued that the evidence was being offered to provide context and to rebut Payano's claim of

¶ 36. In terms of relevance, the court of appeals stated that it was "not persuaded that Kojis'[s] testimony regarding the presence of cocaine and a gun at Payano's residence the day before supports the inference urged by the State, i.e., that Payano would reasonably have known the police had a search warrant." *Payano,* 312 Wis. 2d 224, ¶ 24. Instead, the court agreed with Payano:

> [T]he alleged presence of cocaine at [Payano's] residence the day before the shooting no more supports the proposition that he thus believed that the men attempting to break down his door were police, than it does the notion that Payano believed they were hoodlums seeking to harm him, his mother, and his cousin, and steal the cocaine.

*Id.* (internal quotation omitted). Because the court of appeals ruled that the other acts evidence was not relevant, it declared that the circuit court erred in admitting such evidence. *Id.,* ¶ 25.

¶ 37. Beyond declaring that the other acts evidence was not relevant, the court of appeals concluded that the evidence's unfair prejudice substantially outweighed its probative value. *See id.,* ¶¶ 26–32. In weighing the unfair prejudice against the probative value, the court began by noting that it had already determined the other acts evidence was not relevant, and thus, the court stated that the probative value of the evidence, "if any, is negligible." *Id.,* ¶ 28. The court of appeals then decided that the evidence caused Payano unfair prejudice because "the logical inference for the jury to draw" from the other acts evidence is "that

---

self-defense. *See State v. Payano,* 2008 WI App 74, ¶¶ 17–19, 312 Wis. 2d 224, 752 N.W.2d 378; *see also Sullivan,* 216 Wis. 2d at 783.

Payano was a drug dealer." *Id.*, ¶¶ 31–32. Therefore, the court of appeals concluded that the circuit court "erroneously exercised its discretion in admitting the other acts evidence." *Id.*, ¶ 32.

¶ 38. After determining that the circuit court's exercise of discretion was erroneous and that the other acts evidence submitted by the State should not have been admitted, the court of appeals held that the circuit court's error was not harmless because the evidence " 'created a definite risk that the conviction might be based on that evidence.' " *Id.*, ¶ 37 (quoting *State v. Spraggin,* 77 Wis. 2d 89, 101–02, 252 N.W.2d 94 (1977)). Ultimately, the court concluded that it could not say with any degree of certainty that the circuit court's decision to admit the other acts evidence "did not influence the jury or had such [a] slight effect as to be de minimus." *Id.*, ¶ 36 (internal quotation and citations omitted). Consequently, the court of appeals ordered that Payano's convictions be reversed and that his case be remanded for a new trial.

¶ 39. We granted the State's petition for review on July 28, 2008.

## II. STANDARD OF REVIEW

¶ 40. This case requires us to determine whether the circuit court erroneously exercised its discretion when it allowed the admission of other acts evidence against Payano. *See Sullivan,* 216 Wis. 2d at 780–81; *see also State v. Davidson,* 2000 WI 91, ¶ 53, 236 Wis. 2d 537, 613 N.W.2d 606; *State v. Pharr,* 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983).

¶ 41. In these circumstances, we are to determine whether the circuit court "reviewed the relevant facts; applied a proper standard of law; and using a rational

process, reached a reasonable conclusion." *Davidson,* 236 Wis. 2d 537, ¶ 53 (citing *Sullivan,* 216 Wis. 2d at 780–81); *see also State v. Hunt,* 2003 WI 81, ¶ 34, 263 Wis. 2d 1, 666 N.W.2d 771. If, for whatever reasons, the circuit court failed to delineate the factors that influenced its decision, then it erroneously exercised its discretion. *Hunt,* 263 Wis. 2d 1, ¶ 34; *see also Sullivan,* 216 Wis. 2d at 781; *Pharr,* 115 Wis. 2d at 342–43. However, "[r]egardless of the extent of the trial court's reasoning, we will uphold a discretionary decision if there are facts in the record which would support the trial court's decision had it fully exercised its discretion." *State v. Shillcutt,* 116 Wis. 2d 227, 238, 341 N.W.2d 716 (Ct. App. 1983) (citing *Hammen v. State,* 87 Wis. 2d 791, 800, 275 N.W.2d 709 (1979)); *see also Sullivan,* 216 Wis. 2d at 781; *Pharr,* 115 Wis. 2d at 343.

### III. DISCUSSION

¶ 42. The State contends that the circuit court correctly admitted the other acts evidence and that the court's decision should not have been disturbed by the court of appeals. According to the State, the court of appeals erred by applying the wrong standard of review. In particular, the State alleges that, "[w]hile setting forth the appropriate standard of review—review for an erroneous exercise of discretion"—the court of appeals failed to "seek[] reasons to sustain the circuit court's reasonable decision." Instead, it claims, "the court of appeals reversed the circuit court seemingly because it did not *agree* with the circuit court's ruling." The State argues that the circuit court should have been upheld because it "undertook a reasonable inquiry, and a reasonable judge could have made this ruling."

¶ 43. The State supports its position by employing the three-part test set forth in *Sullivan.* First, the

State declares that the purposes for which the other acts evidence was offered—to provide context and to rebut Payano's self-defense claim—are proper purposes under Wis. Stat. § 904.04(2). *See Payano,* 312 Wis. 2d 224, ¶¶ 17–19. In this regard, it does not differ from the court of appeals. *Id.*

¶ 44. Second, the State claims that its other acts evidence was highly relevant for both rebutting the reasonableness of Payano's self-defense claim and providing context. In terms of rebutting Payano's claim of self-defense and defense of others, the State argues that, "[u]nder the low threshold for relevance," the court of appeals should have sustained the circuit court's ruling because the other acts evidence "made it more likely that Payano knew (or should have known) at the time the search warrant was executed, that it was the police, not armed thugs, who were at his door." As to context, the State asserts that the court of appeals "ignored the context purpose for which the evidence was highly relevant." According to the State, its proffered other acts evidence was relevant to context because it would assist the jury in understanding what the police were doing at 905 West Harrison Avenue on October 3, 2005. In short, "it 'filled in the gaps' as to why the police were at Payano's residence to begin with."

¶ 45. Finally, the State argues that the danger of unfair prejudice from the admission of the other acts evidence in this case does not substantially outweigh the probative value of that evidence. The State claims that the court of appeals erred in the following ways: (1) it "set the prejudice standard too high, because if it had considered the evidence in terms of the *context* purpose . . . it would have concluded . . . that the probative value of the evidence was equal or close to its prejudicial effect, thereby rendering the evidence ad-

missible"; (2) it did not appreciate the value of the other acts evidence as it related to Payano's claim of self-defense, thus unfairly depriving the State of its ability to prove its case, because that evidence was the *only* way for the State to prove, beyond a reasonable doubt, the objective unreasonableness of the self-defense claim; and (3) it "disregarded the facts of the case when it found that the circuit court's limitations on the evidence and the parties' admonitions to the jury did not suffice to mitigate the prejudicial effect" of the other acts evidence. Thus, according to the State, the probative value of the other acts evidence was greater than, or at least equal to, the danger it presented for unfair prejudice.

¶ 46. As an alternative, the State argues that, *if* this court should find that the circuit court committed error by admitting the other acts evidence, the error should be considered harmless and Payano's conviction should be upheld. The State claims that the untainted evidence presented at trial, which included testimony from Officer Lutz and the other officers who attempted to execute the search warrant, established beyond a reasonable doubt that Payano knew or should have known that it was the police at the apartment door and that his actions were intended to wound or kill one of the officers.

¶ 47. Payano disagrees strenuously. He claims that the court of appeals' decision was correct when it scrupulously applied *Sullivan* to reverse the circuit court's erroneous ruling. Payano argues that the other acts evidence was not admissible because it lacked relevancy and because its danger of unfair prejudice far exceeded any probative value the evidence may have had. In particular, Payano states that the other acts evidence "did *not* actually relate to any fact consequential to either the charges or [his] defenses" but *did*

unfairly prejudice him because it painted him as a drug dealer "even though he was not charged with or tried on any drug-related crime."

¶ 48. Although Payano concedes that the State offered the other acts evidence for a proper purpose, he claims that the evidence was "wholly irrelevant" to any consequential fact in the case. Payano supports his irrelevancy argument with the following comment: "Here, it is not more likely that Payano lacked a reasonable belief that he and his family members were in danger on October 3, 2005, simply because he was allegedly observed packaging cocaine in his residence on October 2, 2005."

¶ 49. Finally, Payano states that the other acts evidence was unfairly prejudicial because it created the perception that he was a drug dealer. According to Payano, the admission of the other acts evidence "created an opportunity for the jury to conclude, impermissibly . . . that [he] fired the shot not in self-defense or in defense of others, but because he was a 'drug dealer.' " In fact, Payano claims, his case "presents a classic example of how 'other acts' evidence can unfairly prejudice a defendant" by improperly influencing the jury. Payano then asserts that the danger of unfair prejudice from the other acts evidence "clearly and substantially outweighed any possible probative value" associated with the evidence.

¶ 50. Payano emphasizes that the admission of the evidence was not harmless error. Payano agrees with the court of appeals that the error was not harmless because the evidence portrayed him as an armed drug dealer. *Id.*, ¶¶ 35–37. As Payano sees it, "The erroneous admission of this powerful evidence certainly affected [his] substantial right to proffer legitimate legal defenses to the charged counts without

the interference of irrelevant and impermissible 'other acts' evidence." Consequently, Payano asks that we affirm the court of appeals' decision and remand the case for a new trial.

¶ 51. In our review, the ultimate question "is not whether this court would have admitted the other [acts] evidence, but whether the trial court exercised its discretion in accordance with accepted legal standards and in accordance with the facts of record." *Davidson,* 236 Wis. 2d 537, ¶ 53 (internal quotations and citations omitted); *see also Hunt,* 263 Wis. 2d 1, ¶ 42; *Pharr,* 115 Wis. 2d at 342. Evidence in the record should demonstrate "that discretion was in fact exercised and the basis of that exercise of discretion should be set forth." *Hunt,* 263 Wis. 2d 1, ¶ 42 (internal quotations and citations omitted). The reasons stated in the record need not be exhaustive. "It is enough that they indicate to the reviewing court that the trial court undertook a reasonable inquiry and examination of the facts and the record shows that there is a reasonable basis for the . . . court's determination." *State v. Jeske,* 197 Wis. 2d 905, 912, 541 N.W.2d 225 (Ct. App. 1995) (internal quotations and citations omitted) (ellipsis in original). The circuit court's decision will be upheld "unless it can be said that no reasonable judge, acting on the same facts and underlying law, could reach the same conclusion." *Id.* at 913.

¶ 52. We conclude that, because the circuit court made its ruling using the appropriate legal standards under *Sullivan,* sufficiently explained its rationale on the record, and came to a reasonable conclusion, we must affirm its decision to admit the other acts evidence against Payano. The circuit court's decision was *not* a decision that no reasonable judge could make. *See*

*Hunt*, 263 Wis. 2d 1, ¶ 42; *Davidson*, 236 Wis. 2d 537, ¶ 53; *Pharr*, 115 Wis. 2d at 342; *Jeske*, 197 Wis. 2d at 912–13.

## A. Overview of Other Acts Evidence

¶ 53. For many years, character evidence,[8] such as evidence of other crimes, wrongs, or acts, was admissible only when it directly proved an element of the crime, such as "guilty knowledge" or "specific intent." *See Paulson v. State*, 118 Wis. 89, 98–99, 94 N.W. 771 (1903). Evidence of "other acts" was inadmissible if it was offered "for the purpose of proving general character, criminal propensity or general disposition on the

---

[8] Although sometimes referred to as "propensity evidence," we use the term "character evidence" throughout this opinion when referring broadly to "[e]vidence regarding someone's personality traits; evidence of a person's moral standing in a community." *Black's Law Dictionary* 576 (7th ed. 1999). One category of character evidence is "other acts" evidence, which is governed in Wisconsin by Wis. Stat. § 904.04(2). *See* 7 Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence* § 404.1 at 145–46 (3d ed. 2008). Professor Blinka defines other acts evidence as follows:

> "Other acts" embrace a wide variety of human conduct. Wis[consin] Stat. § 904.04(2) applies to "crimes, wrongs, or acts" that occurred at some time and place *other* than the event being litigated. Most often the "act" is a discrete event, occurring at a particular time and place, yet it may also be largely verbal in character (e.g., a threat to kill). The incident need not have resulted in a criminal conviction or a civil judgment. Nor must it constitute a "bad" act (although it often is). The "other" act may have occurred before or after the event which is being litigated, provided it is relevant. Moreover, the other act may be that of a party, a witness or a third person. The key is relevance: What is it being offered to prove, and does it have any tendency to make that proposition more or less likely?

Blinka, *supra*, § 404.6 at 173–75 (internal footnotes omitted).

issue of guilt or innocence." *Whitty v. State,* 34 Wis. 2d 278, 291–92, 149 N.W.2d 557 (1967) ("[S]uch evidence, while having probative value, is not legally or logically relevant to the crime charged.").

¶ 54. In *Whitty,* the court recognized four separate bases for excluding other acts evidence:

> (1) The overstrong tendency to believe the defendant guilty of the charge merely because he is a person likely to do such acts; (2) the tendency to condemn not because he is believed guilty of the present charge but because he has escaped punishment from other offenses; (3) the injustice of attacking one who is not prepared to demonstrate the attacking evidence is fabricated; and (4) the confusion of issues which might result from bringing in evidence of other crimes.

*Id.* at 292; *see also Hunt,* 263 Wis. 2d 1, ¶ 30; *Sullivan,* 216 Wis. 2d at 782–83. Over time, however, courts permitted the admission of other acts evidence when it was probative for some other specified purpose. *Whitty* noted that "evidence of prior crimes [other acts] is admissible when such evidence is particularly probative in showing elements of the specific crime charged, intent, identity, system of criminal activity, to impeach credibility, and to show character in cases where character is put in issue by the defendant." *Whitty,* 34 Wis. 2d at 292. The court explained as follows: "The admission of evidence of prior crimes [other acts] for such purposes is not forbidden because such evidence would not be admissible under the general character rule." *Id.*

¶ 55. In 1973, following the *Whitty* decision, the supreme court adopted the Wisconsin Rules of Evidence, which were submitted to the court by the Wisconsin Judicial Council. 59 Wis. 2d R1 (1973). The rules included Wis. Stat. § 904.04, entitled "Character evidence not admissible to prove conduct; exceptions;

383

other crimes." *Id.* at R75. The rule was modeled on Rule 404 of the Federal Rules of Evidence. The evidence admissible under subsection (2) of § 904.04 is sometimes referred to as *Whitty* evidence. *See Holmes v. State,* 76 Wis. 2d 259, 266, 251 N.W.2d 56 (1977); *see also State v. Veach,* 2002 WI 110, ¶ 46, 255 Wis. 2d 390, 648 N.W.2d 447 (referring to other acts evidence under Wis. Stat. § 904.04(2) as "*Whitty* evidence"); 7 Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence* § 404.1 at 146 (3d ed. 2008) ("Wis[consin] Stat. § 904.04 governs the admissibility of character evidence as circumstantial evidence of conduct as well as the admissibility of 'other acts' to prove something other than character, such as intent, knowledge, or identity.").

¶ 56. Today, Wis. Stat. § 904.04[9] is divided into two subsections. Subsection (1) is a restriction on the use of *general* character evidence as circumstantial

---

[9] *904.04 Character evidence not admissible to prove conduct; exceptions; other crimes.* (1) CHARACTER EVIDENCE GENERALLY. Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

(a) *Character of accused.* Evidence of a pertinent trait of the accused's character offered by an accused, or by the prosecution to rebut the same;

(b) *Character of victim. . . .*

(c) *Character of witness. . . .*

(2) OTHER CRIMES, WRONGS, OR ACTS. (a) Except as provided in par. (b), evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

(b) In a criminal proceeding alleging a violation of s. 940.225(1) [first degree sexual assault] or 948.02(1), sub. (1) and

proof "that the person acted in conformity therewith on a particular occasion." Wis. Stat. § 904.04(1). Subsection (2) is a prohibition on the use of *specific* character evidence—"other crimes, wrongs, or acts"—to prove the character of a person "in order to show that the person acted in conformity therewith." Wis. Stat. § 904.04(2). Subsection (2) then continues as follows: "This subsection does not exclude the evidence when offered for other purposes, *such as* [1] proof of motive, [2] opportunity, [3] intent, [4] preparation, [5] plan, [6] knowledge, [7] identity, or [8] absence of mistake or accident." *Id.* (emphasis added).

¶ 57. To be admissible, other acts evidence offered for a proper purpose also must be relevant according to Wis. Stat. § 904.01. Even when relevant and offered for a proper purpose, the other acts evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03. *See Sullivan,* 216 Wis. 2d at 772–73; Blinka, *supra,* § 404.6 at 170, 179–88.

¶ 58. This framework for the admission of other acts evidence was set forth in *Sullivan* as a comprehensive, three-step analysis[10] "that governs other act evi-

par. (a) [first degree sexual assault of a child] do not prohibit admitting evidence that a person was convicted of a violation of s. 940.225(1) or 948.02(1) or a comparable offense in another jurisdiction, that is similar to the alleged violation, as evidence of the person's character in order to show that the person acted in conformity therewith.

[10] Prior to *Sullivan,* some courts phrased the test as a two-part inquiry, asking whether the evidence was offered for a proper statutory purpose and whether the evidence's probative

385

dence in all cases." Blinka, *supra,* § 404.6 at 169, 179 ("The court's analysis should be closely followed in all cases ... regardless of which party is proposing or opposing the evidence.").

B. *Sullivan* and the Admissibility of Other Acts Evidence

¶ 59. In 1998, this court took the opportunity to "reaffirm the vitality of Wis. Stat. § (Rule) 904.04(2) and *Whitty*" in response to concerns that the case law had steadily "chipped away" at the rule. *Sullivan,* 216 Wis. 2d at 775; Blinka, *supra,* § 404.6 at 170. Today, *Sullivan*'s three-part inquiry has become "the definitive approach governing the admissibility of other act evidence." Blinka, *supra,* § 404.6 at 179.

¶ 60. Specifically, *Sullivan* set forth the following "analytical framework" for courts to follow when determining the admissibility of such evidence:

(1) Is the other acts evidence offered for an acceptable purpose under Wis. Stat. § (Rule) 904.04(2), such as establishing motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident?

(2) Is the other acts evidence relevant, considering the two facets of relevance set forth in Wis. Stat. § (Rule) 904.01? The first consideration in assessing

value was substantially outweighed by its danger of unfair prejudice. The question of relevancy was folded into the first inquiry of whether the evidence was offered for a proper purpose. *See, e.g., State v. Speer,* 176 Wis. 2d 1101, 1114, 501 N.W.2d 429 (1993); *State v. Pharr,* 115 Wis. 2d 334, 343–44, 340 N.W.2d 498 (1983); *see also Sullivan,* 216 Wis. 2d at 771 n.3; Blinka, *supra,* § 404.6 at 170 n.3

relevance is whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action. The second consideration in assessing relevance is whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence.

(3) Is the probative value of the other acts evidence substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence? *See* Wis. Stat. § (Rule) 904.03.

*Sullivan,* 216 Wis. 2d at 772–73 (internal footnote omitted); *see also* Blinka, *supra,* § 404.6 at 170. Because "[t]he admission of other acts evidence is one of the most commonly litigated issues in criminal cases,"[11] the *Sullivan* framework and its attending principles have become "familiar and well established" in Wisconsin jurisprudence. *Davidson,* 236 Wis. 2d 537, ¶¶ 34–35.

1. Proper Purpose

¶ 61. The first step in the *Sullivan* analysis is to determine whether the other acts evidence has been offered for a proper purpose. *Sullivan,* 216 Wis. 2d at 772, 783; *Davidson,* 236 Wis. 2d 537, ¶ 35.

¶ 62. Wisconsin Stat. § 904.04(2) prohibits the use of other acts evidence for the purpose of proving an individual's character as circumstantial proof that the

---

[11] Wis JI—Criminal 275 at 3 (2003). All subsequent references to the Wisconsin Criminal Jury Instructions are to the 2003 version unless otherwise indicated.

person acted in conformity therewith on a particular occasion. *See* Wis. Stat. § 904.04(2); *Sullivan,* 216 Wis. 2d at 782 ("[Section] 904.04(2) forbids a chain of inferences running from act to character to conduct in conformity with the character."); *State v. Speer,* 176 Wis. 2d 1101, 1113–15, 501 N.W.2d 429 (1993); Blinka, *supra,* §§ 404.1 at 146, 149–50, 404.6 at 172. However, if other acts evidence is offered for a purpose not associated with proving an individual's character and propensity to act in conformity therewith, the evidence is *not* prohibited by Wis. Stat. § 904.04(2). *See* Wis. Stat. § 904.04(2); *Sullivan,* 216 Wis. 2d at 783 ("[Section 904.04(2)] permits the admission of other acts evidence if its relevance does not hinge on an accused's propensity to commit the act charged."); *Speer,* 176 Wis. 2d at 1113–15.

¶ 63. Wisconsin Stat. § 904.04(2) performs dual functions: (1) it acts as an *exclusionary* rule that "precludes the use of a person's character as circumstantial evidence of conduct"; and (2) it acts as an *inclusionary* rule that allows "other act evidence [to] be used to prove something other than the forbidden propensity inference." Blinka, *supra,* § 404.6 at 171–72. The proponent of other acts evidence must demonstrate a proper purpose by a preponderance of the evidence. Blinka, *supra,* § 404.1 at 149, § 404.6 at 180. As long as the proponent identifies one acceptable purpose[12] for

[12] As noted, Wis. Stat. § 904.04(2) lists several purposes for which other acts evidence may be offered, including "proof of motive, opportunity, identity, preparation, plan, knowledge, intent, or absence of mistake or accident." The purposes listed are not mutually exclusive, "and the same evidence may fall into more than one exception." *State v. Hunt,* 2003 WI 81, ¶ 29, 263 Wis. 2d 1, 666 N.W.2d 771 (quoting *State v. Hammer,* 2000 WI

admission of the evidence that is not related to the forbidden character inference, the first step is satisfied. *See Hunt,* 263 Wis. 2d 1, ¶ 29 (quoting *State v. Hammer,* 2000 WI 92, ¶ 29 n.4, 236 Wis. 2d 686, 613 N.W.2d 629 (citing *Sullivan,* 216 Wis. 2d at 772, and *State v. Alsteen,* 108 Wis. 2d 723, 729, 324 N.W.2d 426 (1982))); Blinka, *supra,* § 404.6 at 180. Consequently, this "first step is *hardly demanding."* Blinka, *supra,* § 404.6 at 180 (emphasis added).

■

¶ 64. In this case, the State argues that it proffered the other acts evidence for two proper purposes, namely: (1) to provide the jury greater context for the shooting "in order to give the State's case a complete presentation"; and (2) to rebut Payano's claim of self-defense.[13] The circuit court agreed that both purposes

92, ¶ 29 n.4, 236 Wis. 2d 686, 613 N.W.2d 629); Wis JI—Criminal 275 at 4; Wis JI—Criminal 275.1 at 2 (1990).

Moreover, "[t]his list is not complete . . . and is meant only to be illustrative." *State v. Clemons,* 164 Wis. 2d 506, 514, 476 N.W.2d 283 (Ct. App. 1991); *see also State v. Shillcutt,* 116 Wis. 2d 227, 236, 341 N.W.2d 716 (Ct. App. 1983) (citing *United States v. Woods,* 484 F.2d 127, 134 (4th Cir. 1973)); Blinka, *supra,* § 404.6 at 173 ("The rule does not require that courts pigeonhole (or, more accurately, 'jam') the other act evidence into one of these categories.").

[13] The Wisconsin Jury Instructions define evidence relating to "context or background" as "provid[ing] a more complete presentation of the evidence relating to the offense charged." Wis JI—Criminal 275 at 2; *see also Clemons,* 164 Wis. 2d at 514; Blinka, *supra,* § 404.7 at 198–99. In other words, the information is "necessary to fully understand the context of the case." *Shillcutt,* 116 Wis. 2d at 237; *see also* Blinka, *supra,* § 404.7 at 198–99.

Although rebutting the defendant's theory of defense is not explicitly mentioned in Wis. Stat. § 904.04(2), precedent firmly

were permissible under Wis. Stat. § 904.04(2). *See Payano,* 312 Wis. 2d 224, ¶¶ 17–19. The circuit court determined that Kojis's testimony placed into context what the police were doing at Payano's apartment and what Payano was seen doing there the day before. This testimony helped the jury assess the reasonableness of Payano's claim of self-defense. *See supra,* ¶¶ 31–33.

¶ 65. The question that inevitably occurs to an outsider looking at this shooting is *why* Payano shot at the door. This implicates Payano's claim of self-defense. It also implicates his motive and knowledge. Motive and knowledge are both enumerated purposes for the admission of other acts evidence under Wis. Stat. § 904.04(2).

¶ 66. Payano has never asserted that the other acts evidence was not offered for a proper purpose. In fact, in his brief to this court, Payano explicitly acknowledges that "these are acceptable purposes for offering 'other acts' evidence." The circuit court did not erroneously exercise its discretion on the issue of purpose.

### 2. Relevance

¶ 67. The second step in the *Sullivan* analysis is to assess whether the evidence is relevant as defined by Wis. Stat. § 904.01. *Sullivan,* 216 Wis. 2d at 772, 785; *Davidson,* 236 Wis. 2d 537, ¶ 35; Blinka, *supra,* § 404.6

---

establishes that it is an acceptable purpose. *See Sullivan,* 216 Wis. 2d at 784 ("Evidence of other acts may be admitted if it tends to undermine an innocent explanation for an accused's charged criminal conduct."); *State v. Kourtidias,* 206 Wis. 2d 574, 582, 557 N.W.2d 858 (Ct. App. 1996) ("[T]his other acts evidence was very relevant to this theory of defense.").

at 170, 180–83. Because other acts evidence is inherently relevant to prove character and therefore a propensity to behave accordingly, *"the real issue is whether the other act is relevant to anything else."* Blinka, *supra,* § 404.6 at 181 (emphasis added); *see also State v. Johnson,* 184 Wis. 2d 324, 337 n.1, 516 N.W.2d 463 (Ct. App. 1994) (quoting Daniel D. Blinka, *Evidence of Character, Habit, and "Similar Acts" in Wisconsin Civil Litigation,* 73 Marq. L. Rev. 283, 304 n.66 (1989)).

¶ 68. " 'Relevant evidence' means evidence having *any tendency* to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Wis. Stat. § 904.01 (emphasis added). Stated differently, for evidence to be relevant, the following questions must be answered affirmatively: "(1) is the proposition for which the evidence is offered of 'consequence to the determination of the action' and (2) does the evidence have probative value when offered for that purpose?"[14] Blinka, *supra,* § 404.6 at 181; *see also Sullivan,* 216 Wis. 2d at 772 (stating the two relevancy considerations as follows: "whether the other acts evidence relates to a fact or proposition that is of consequence to the determination of the action," and "whether the evidence has probative value, that is, whether the other acts evidence has a tendency to make the consequential fact or proposition more probable or less probable than it would be without the evidence"); Blinka, *supra,* § 404.6 at 170 (quoting *Sullivan,* 216 Wis. 2d at 772).

---

[14] The proponent bears the burden of proving relevance by a preponderance of the evidence. *Hunt,* 263 Wis. 2d 1, ¶ 53 (citing *Sullivan,* 216 Wis. 2d at 774); Blinka, *supra,* § 404.6 at 181.

¶ 69. Answering the first question of whether the evidence is offered in relation to any fact or proposition that is of consequence to the determination of the action, the court must focus its attention on the pleadings and contested issues in the case. Blinka, *supra,* § 404.6 at 181. "The pleadings set forth the elements of the claims, charges, or defenses. Unless parties stipulate or fail to contest them, all such elements as well as any propositions tending to establish them are fairly in dispute." *Id.*; *see also Sullivan,* 216 Wis. 2d at 785–86 ("The substantive law determines the elements of the crime charged and the ultimate facts and links in the chain of inferences that are of consequence to the case."). "The relevancy requirement is not met if the issue on which the evidence is offered . . . is not in dispute in the case . . . ." Wis JI—Criminal 275.1 at 2 (1990) (citing *Alsteen,* 108 Wis. 2d at 730).[15]

---

[15] This general statement must be qualified by the fact that "in criminal cases the State 'must prove all elements of a crime, even elements the defendant does not dispute.' " Blinka, *supra,* § 404.6 at 184 (quoting *State v. Veach,* 2002 WI 110, ¶ 121, 255 Wis. 2d 390, 648 N.W.2d 447); *see also Veach,* 255 Wis. 2d 390, ¶¶ 118–21 ("[W]ith the exception of stipulations to a defendant's status, the state and the court are not obligated to accept stipulations to elements of a crime even if the stipulations are offered in compliance with [Wisconsin law]."); *Hammer,* 236 Wis. 2d 686, ¶ 25 ("If the state must prove an element of a crime, then evidence relevant to that element is admissible, even if a defendant does not dispute the element.") (citing *State v. Plymesser,* 172 Wis. 2d 583, 594–95, 493 N.W.2d 367 (1992)); *State v. Davidson,* 2000 WI 91, ¶ 65, 236 Wis. 2d 537, 613 N.W.2d 606 ("The state must prove all the elements of a crime beyond a reasonable doubt, even if the defendant does not dispute all of the elements . . . .") (internal quotations and citations omitted) (ellipsis in original).

¶ 70. The second question relating to probative value—whether the consequential fact or proposition for which the evidence was offered becomes more or less probable than it would be without the evidence—"is a common sense determination based less on legal precedent than life experiences." Blinka, *supra,* § 404.6 at 181; *see also Pharr,* 115 Wis. 2d at 344 ("The issue of relevancy 'must be determined by the trial judge in view of his or her experience, judgment and knowledge of human motivation and conduct.'" (quoting *United States v. Williams,* 545 F.2d 47, 50 (8th Cir. 1976) (citing C. McCormick, *Handbook of The Law of Evidence,* § 185 at 438 (Hornbook Series 2d ed. 1972)))). Although some other acts cases focus "on the other incident's nearness in time, place and circumstances to the alleged crime or to the fact or proposition sought to be proved," *Sullivan,* 216 Wis. 2d at 786 (citing *Whitty,* 34 Wis. 2d at 294), Blinka, *supra,* § 404.6 at 181, " '[s]imilarity' and 'nearness' are not talismans. Sometimes dissimilar events will be relevant to one another." Blinka, *supra,* § 404.6 at 181–82; *see also Pharr,* 115 Wis. 2d at 346 ("Relevancy is not determined by resemblance to, but by the connection with, other facts.") (internal quotations and citations omitted).

¶ 71. Here, the other acts evidence, Kojis's testimony and the information he provided Officer Lutz regarding his observations of drugs and a gun at Payano's apartment, was timely and was deemed relevant by the circuit court for the following reasons:

> *The jury [in the first trial], I believe, was left with the impression that this search warrant was somehow arbitrary, based on nothing, that the police came storming into a place with no basis really for doing that, that it may have been somehow a violation of Mr. Payano's*

*rights,* that Mr. Payano was a sometime beautician or hair cutter, that his English was not good, and *that he had no reason to expect the police to be coming. And in that context, I think self-defense is framed somewhat differently.*

*Self-defense is,* as defined in [Wis. Stat. §] 939.48, *a person who is privileged to intentionally use force against another* for the purpose of preventing or terminating what the person *reasonably believes* to be an unlawful interference with his or her person. And by extension, it goes to the protection of others.[16]

*The jury clearly has to be able to deal with what is reasonable under those circumstances for a reasonable person. I think that the testimony from Mr. Kojis, which clearly places into context what the police were doing there and what Mr. Payano was observed with on the day before, helps the jury to assess reasonability.* It does

---

[16] Self-defense and defense of others is defined by Wis. Stat. § 939.48(1) and (4), respectively, as follows:

(1) A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person reasonably believes to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor reasonably believes is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

. . . .

(4) A person is privileged to defend a 3rd person from real or apparent unlawful interference by another under the same conditions and by the same means as those under and by which the person is privileged to defend himself or herself from real or apparent unlawful interference, provided that the person reasonably believes that the facts are such that the 3rd person would be privileged to act in self-defense and that the person's intervention is necessary for the protection of the 3rd person.

provide, I think, a somewhat different understanding for the jury about what was going on.

. . . .

*. . . But I think it is testimony that places into context the entire situation. And I think it is important to the jury to be able to struggle with what Mr. Payano reasonably believed at the time the search warrant was executed.*

. . . .

But I do think that the context and the testimony of this witness is something that the jury should hear for a very narrow point. And I certainly will instruct the jury that they are to consider this only on the issue of whether or not Mr. Payano reasonably believed that it was armed thugs that were attacking his door.

(Emphasis added.)

¶ 72. As the circuit court's ruling makes clear, the central dispute at trial was whether Payano acted reasonably in self-defense and defense of others when he shot Officer Lutz—whether he knew or should have known it was the police at the apartment door when he shot the gun. In other words, as the State argued, "the jury needed to decide between two competing *motives* for the shooting: to protect his family, as Payano argued; or to buy time to hide drug evidence, as the State argued." (Emphasis added.) Payano's entire defense theory was premised on the fact that he acted reasonably to protect himself and his family when he shot Officer Lutz. Hence, what Payano knew or reasonably believed at the time of the shooting was paramount to the "determination of the action." Wis. Stat. § 904.01; *Sullivan,* 216 Wis. 2d at 772; *see also* Wis. Stat. § 939.48(1) and (4).

¶ 73. In terms of context, the other acts evidence provided the jury with a greater understanding of the alleged circumstances that led to Officer Lutz being shot. The context in which the shooting took place was of consequence in this case because the circumstances leading up to the shooting were pertinent factors for the jury to consider when it determined the reasonableness of Payano's actions. *See State v. Clemons,* 164 Wis. 2d 506, 514–15, 476 N.W.2d 283 (Ct. App. 1991) (finding the other acts evidence offered by the State relevant and admissible because it "g[a]ve the State's case a complete presentation"); *Shillcutt,* 116 Wis. 2d at 236–237 (finding the other acts evidence offered by the State relevant and admissible because it "was necessary to fully understand the context of the case"); *see also United States v. Edwards,* 159 F.3d 1117, 1129 (8th Cir. 1998) (completes the story of the crime); *United States v. Bettelyoun,* 892 F.2d 744, 746–47 (8th Cir. 1989) (integral part of immediate context); *Carter v. United States,* 549 F.2d 77, 78 (8th Cir. 1977) (completes the story of the crime on trial by proving its immediate context).

¶ 74. In terms of rebutting Payano's defense, the other acts evidence was offered in relation to proving the State's theory of the case beyond a reasonable doubt, which entailed disproving Payano's claim of self-defense and defense of others beyond a reasonable doubt. Proving the State's theory and disproving the defendant's theory were consequential to whether Payano acted reasonably, and ultimately, to whether he was guilty of the crimes charged. *See Davidson,* 236 Wis. 2d 537, ¶ 65 ("The State must prove all the elements of a crime beyond a reasonable doubt . . . .") (internal quotations and citations omitted); *Sullivan,* 216 Wis. 2d at 784 (stating that other acts evidence "may be admitted

if it tends to undermine an innocent explanation"); *State v. Kourtidias,* 206 Wis. 2d 574, 582, 557 N.W.2d 858 (Ct. App. 1996) ("[T]his other acts evidence was very relevant to this theory of defense.").

¶ 75. In sum, Kojis's testimony and the information he provided to Officer Lutz was offered by the State to undermine Payano's claim of self-defense and defense of others by offering an alternative theory of the case, that Payano's shooting of Officer Lutz was criminal rather than privileged. Consequently, the State's other acts evidence satisfies the first prong of the relevancy analysis because it was offered to help prove a "fact [or proposition] that is of consequence to the determination of" Payano's guilt or innocence. Wis. Stat. § 904.01.

¶ 76. The other acts evidence satisfies the second prong of the relevancy test as well, because its admission made the State's claim—that Payano shot the gun to deter the police from entering the apartment so that he would have time to get rid of drugs—more probable than it would have been without the evidence, and it made Payano's claim—that he shot the gun to protect himself and his family—less probable than it would have been without the evidence. *See* Wis. Stat. § 904.01; *Sullivan,* 216 Wis. 2d at 772; Blinka, *supra,* § 404.6 at 181; *see also Sullivan,* 216 Wis. 2d at 784 ("Evidence of other acts may be admitted if it tends to undermine an innocent explanation for an accused's charged criminal conduct."); *Kourtidias,* 206 Wis. 2d at 582 ("[T]his other acts evidence was very relevant to this theory of defense.").

¶ 77. For instance, offering the other acts evidence as a contextual aid provided the jury a more complete explanation as to why the police descended on 905 West Harrison Avenue and broke in the door of Apartment No. 4 on October 3, 2005. The evidence

allowed the jury to hear the complete story of the crime from the State's perspective.[17] Payano claims, in essence, either that the police did not identify themselves, or that he did not hear them, understand them, or believe them. When asked whether he knew that the men on the other side of the door were police, Payano answered, "I never imagined that." This testimony is more plausible absent the Kojis testimony. Without that testimony, it was more probable that the jury would perceive Payano as a victim, a regular citizen defending his home against unprovoked attack. With the Kojis evidence, however, it was more probable that the jury would perceive Payano as a criminal actor trying to eliminate evidence of his crime. The other acts evidence offered by the State was relevant because it made Payano's claim of self-defense and defense of others less probable than it would have been without the evidence. *See* Wis. Stat. § 904.01; *Sullivan,* 216 Wis. 2d at 772; Blinka, *supra,* § 404.6 at 181.

¶ 78. Moreover, offering the other acts evidence as a direct rebuttal to Payano's claim of self-defense gave the jury an alternative explanation for why Payano would have shot the gun knowing that the police were at the apartment door. The evidence is relevant because it directly contradicted Payano's defense theory and made it more probable than it would have been without

---

[17] *See Clemons,* 164 Wis. 2d at 514 ("One basis upon which evidence of other crimes [or acts] may be admitted is if the evidence provides an aspect of the crime charged or is required in order to give a complete presentation of the case at trial."); *Shillcutt,* 116 Wis. 2d at 236 ("[W]e hold that an accepted basis for the admissibility of evidence of other [acts] arises when such evidence furnishes part of the context of the crime or is necessary to a full presentation of the case . . . .") (internal quotations and citation omitted) (ellipsis in original).

the evidence that Payano shot the gun intending to move the police away from the door so that he could have time to get rid of the drugs that were allegedly in the apartment. *See Sullivan*, 216 Wis. 2d at 784 ("Evidence of other acts may be admitted if it tends to undermine an innocent explanation for an accused's charged criminal conduct."). Without this testimony, the State had no real evidence to support its theory that Payano shot Officer Lutz on purpose to hide or eliminate drugs. Therefore, "this other acts evidence was very relevant to this theory of defense." *Kourtidias*, 206 Wis. 2d at 582.

¶ 79. The State offered Kojis's testimony and the information he provided Officer Lutz to undercut Payano's claim of self-defense and defense of others. Because that evidence made Payano's version of the story less probable than it would have been without the evidence, it was relevant. *See* Wis. Stat. § 904.01; *Sullivan*, 216 Wis. 2d at 772; Blinka, *supra*, § 404.6 at 181. The circuit court did not erroneously exercise its discretion on the issue of relevance.

3. Probative Value and Unfair Prejudice

¶ 80. When other acts evidence is relevant and offered for a proper purpose, the evidence is admissible under *Sullivan* unless the opponent[18] demonstrates that "its probative value is *substantially outweighed* by

---

[18] *Hunt*, 263 Wis. 2d 1, ¶¶ 53, 69 ("[I]t is the opponent of the admission of the evidence who must show that the probative value of the evidence is substantially outweighed by unfair prejudice."); *Speer*, 176 Wis. 2d at 1114 ("If relevancy for an admissible purpose is established, the evidence will be admitted unless the opponent of the evidence can show that the probative

399

the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Wis. Stat. § 904.03 (emphasis added); *Sullivan,* 216 Wis. 2d at 772–73, 789; *Davidson,* 236 Wis. 2d 537, ¶ 35; Blinka, *supra,* § 404.6 at 170, 183–88. "The term 'substantially' indicates that *if the probative value of the evidence is close or equal to its unfair prejudicial effect, the evidence must be admitted."* *Speer,* 176 Wis. 2d at 1115 (emphasis added).

¶ 81. The evidence's probative value "largely turns on the relevancy analysis" from step two under *Sullivan.* Blinka, *supra,* § 404.6 at 183. Essentially, probative value reflects the evidence's degree of relevance. Evidence that is highly relevant has great probative value, whereas evidence that is only slightly relevant has low probative value. *See id.* ("The more attenuated its relevancy, the lower its probative value . . . ."). The main consideration in assessing probative value of other acts evidence "is the extent to which the proffered proposition is in substantial dispute"; in other words, "how badly needed is the other act evidence?" *Id.; see also Pharr,* 115 Wis. 2d at 348–49; *Johnson,* 184 Wis. 2d at 338–40.

¶ 82. For example, in *Pharr,* the defendant was charged with and convicted of attempted first-degree murder, party to a crime, for his part in the shooting of a Wisconsin state trooper. *Pharr,* 115 Wis. 2d at 336, 337–38. On October 18, 1980, the defendant and two accomplices set out from Madison to rural Rock County intending to commit armed robbery at a private residence. *Id.* at 337. After completing the robbery, the

value of the other crimes [or acts] evidence is substantially outweighed by the danger of undue prejudice.") (internal citation omitted).

400

three headed back to Madison. *Id.* Their vehicle was stopped by a state trooper who observed it cross the center line of the highway. *Id.* The defendant was a passenger in the vehicle. *Id.* When the trooper approached the vehicle, he noticed a gun on the front seat, whereupon the driver, who had exited the vehicle, reached in the window, grabbed the gun, and fired several shots at the trooper. *Id.* at 337–38.

¶ 83. Following the shooting, the driver jumped back into his vehicle and sped off down the highway. *Id.* at 338. The trooper gave chase and radioed for assistance. *Id.* A second state trooper received the report and began to pursue the vehicle as well. *Id.* As the second trooper was following the vehicle, the defendant reached out the passenger window and fired at least one shot at the police cruiser, shattering its windshield. *Id.* Eventually, the getaway vehicle was stopped and all three people inside were arrested. *Id.*

¶ 84. Although the defendant admitted his involvement in the robbery and that he shot at the second trooper's vehicle, he denied that he encouraged or participated in shooting at the first trooper, an offense for which he had been charged as a party to the crime. *Id.* Prior to his trial, the defendant made a motion in limine seeking to exclude any evidence related to a previous unrelated robbery and any evidence regarding his shooting at the second trooper's vehicle. *Id.* The circuit court granted the motion with respect to the unrelated robbery, but it denied the motion with respect to the second shooting. *Id.* at 339. The circuit court agreed with the prosecution that the shooting "evidence was admissible to show the defendant's state of mind to escape at all costs." *Id.* The defendant was convicted. On appeal, he argued that it was error for the circuit

court to admit evidence related to his shooting at the second trooper's vehicle. *Id.* at 341.

¶ 85. The court of appeals affirmed the conviction and concluded "that any unfair prejudice resulting from this evidence [did] not substantially outweigh its probative value." *Id.* at 349. The court of appeals noted that, although the defendant claimed he did not participate in shooting at the first trooper, when the other acts evidence was considered, "an alternative explanation of the defendant's involvement" in the shooting was evident. *Id.* at 348. The court continued, "In order to establish that part of the plan included a successful escape which was to be effectuated at all costs, *the [S]tate needed to introduce [the other acts] evidence* showing the defendant's active participation in the events incident to the escape phase of the robbery." *Id.* (emphasis added). The other acts evidence was properly admitted in *Pharr* because the evidence was *necessary* to the prosecution's theory of the case, and it provided an alternative explanation to the defendant's claimed innocence. *See id.* at 348; *see also Johnson,* 184 Wis. 2d at 339–41; Blinka, *supra,* § 404.6 at 183. Because the other acts evidence was so important to the resolution of the case, the court could not say that its probative value was substantially outweighed by its danger of unfair prejudice. *See Pharr,* 115 Wis. 2d at 348–49; *see also* Wis. Stat. § 904.03; *Johnson,* 184 Wis. 2d at 339–41; Blinka, *supra,* § 404.6 at 183.

¶ 86. *Johnson* is another case that demonstrates the high level of probative value attached to evidence that is necessary for the resolution of the case. *See Pharr,* 115 Wis. 2d at 348–49; Blinka, *supra,* § 404.6 at 183. In *Johnson,* the defendant was convicted of battery and second-degree reckless endangerment as a repeater, based on allegations by the defendant's former

live-in girlfriend that he physically assaulted her on at least one occasion. *Johnson,* 184 Wis. 2d at 333–34. The defendant maintained that the incident never occurred and that his ex-girlfriend fabricated the story so that he would be arrested and she would have an opportunity to misappropriate certain items of his property while he was in custody. *Id.* at 334.

¶ 87. On appeal, the defendant argued that the circuit court erred by refusing to admit other acts evidence that his ex-girlfriend, within days of his arrest, attempted to gain access to certain items of his property that were in storage. *Id.* at 338. The court of appeals determined that it was error for the circuit court to deny admission of this evidence because it was "directly linked to the criminal events charged." *Id.* 338–39. The court explained its decision as follows:

> If [the defendant] truly owned the disputed property and if [the ex-girlfriend] truly attempted to gain possession of the property following her accusation against him and his resultant incarceration, *the credibility of [the defendant]'s theory of defense is obviously enhanced.* We conclude that *the rejected evidence was highly probative to [the defendant]'s theory of defense.*
>
> . . . .
>
> Although other witnesses testified, this case essentially turned on the jury's assessment of the credibility issue drawn between [the ex-girlfriend] and [the defendant]. [The defendant]'s proffered evidence, *if believed,* offered a plausible scenario as to why [the ex-girlfriend] might have falsely accused him. . . .
>
> . . . *In most instances, as the probative value of relevant evidence increases, so will the fairness of its prejudicial effect.* Thus, the standard for unfair prejudice is not whether the evidence harms the opposing

403

party's case, but rather whether the evidence tends to influence the outcome of the case by "improper means." We fail to see how [the defendant]'s proffered evidence constitutes an improper means to influence the outcome.

*Id.* at 339–41 (first, second, and fourth emphasis added) (internal footnote and citation omitted). Because the other acts evidence was central to the litigation and necessary for the defendant's arguments, the evidence carried great probative value to overcome any prejudicial effect the evidence may have caused. *Id.*; *see also Pharr,* 115 Wis. 2d at 348–49; Blinka, *supra,* § 404.6 at 183.

¶ 88. As for unfair prejudice, in *Whitty,* this court stated that, to ensure a defendant's right to a fair trial, the circuit court must "carefully consider whether the prejudice of other-crimes [or other acts] evidence is so great as compared with its relevancy and the necessity for its admission in the particular case as to require its exclusion." *Whitty,* 34 Wis. 2d at 295. The determination of unfair prejudice must be made with great care because "[n]early all evidence operates to the prejudice of the party against whom it is offered. . . . The test is whether the resulting prejudice of relevant evidence is *fair or unfair." Johnson,* 184 Wis. 2d at 340 (citing *Christensen v. Econ. Fire & Cas. Co.,* 77 Wis. 2d 50, 61–62, 252 N.W.2d 81 (1977)).

¶ 89. In *Sullivan,* the court defined *unfair* prejudice as follows:

Unfair prejudice results when the proffered evidence has a tendency to influence the outcome by improper means or if it appeals to the jury's sympa-

thies, arouses its sense of horror, provokes its instinct to punish or otherwise causes a jury to base its decision on something other than the established propositions in the case.

*Sullivan,* 216 Wis. 2d at 789–90; *see also Johnson,* 184 Wis. 2d at 340 ("[T]he standard for unfair prejudice is not whether the evidence harms the opposing party's case, but rather whether the evidence tends to influence the outcome of the case by 'improper means.'" (citing *Christensen,* 77 Wis. 2d at 61)); Blinka, *supra,* § 404.6 at 185 ("In this context, 'unfair prejudice' refers to the danger that the jury will draw the forbidden propensity [or character] inference regardless of a[] limiting instruction."). The specific danger of unfair prejudice when using other acts evidence "is the potential harm in a jury's concluding that because an actor committed one bad act, he necessarily committed the crime with which he is now charged." *State v. Fishnick,* 127 Wis. 2d 247, 261–62, 378 N.W.2d 272 (1985) (citing *State v. Tarrell,* 74 Wis. 2d 647, 657, 247 N.W.2d 696 (1976)). The circuit court's job is to ensure that the jury will not "prejudge a defendant's guilt or innocence in an action because of his prior bad act." *Id.* at 262.

¶ 90. The situation in which unfair prejudice is most likely to occur is when one party attempts to put into evidence other acts allegedly committed by the opposing party that are similar to the act at issue in the current case. For example, in *State v. McGowan,* 2006 WI App 80, ¶¶ 1, 23–24, 291 Wis. 2d 212, 715 N.W.2d 631, the court of appeals found reversible error where the circuit court allowed the prosecution to present other acts evidence against the defendant that was highly inflammatory. In *McGowan,* the defendant was charged with four counts of first-degree sexual assault of a child stemming from several incidents involving

himself and his cousin ten years earlier (when he was 18 and she was 8). *Id.*, ¶¶ 1–2. During trial, the prosecution was allowed to introduce evidence suggesting that the defendant had assaulted a different female cousin when he was 10 and she was 5.[19] *Id.*, ¶¶ 9–10. After being convicted, the defendant argued to the court of appeals that the circuit court had erred by admitting the other acts evidence. *Id.*, ¶¶ 1, 13.

¶ 91. The court of appeals summarized its reasoning for reversing the conviction:

> Here, the offered evidence . . . undoubtedly aroused the jury's "sense of horror" and "provoke[d] its instinct to punish." *See Sullivan,* 216 Wis. 2d at 789–90. Revulsion as to this conduct is not significantly mitigated by the fact that [the defendant] was only ten years old at the time and the event was an isolated incident. *Given the obvious probable prejudice to the defendant, the probative value of the evidence to prove a legitimate fact of consequence*—which is not proof of the defendant's character—*should be strong indeed.* The slim reeds of probative value identified . . . crumble here under the weight of prejudice to the defendant.

*Id.*, ¶ 23 (emphasis added). The court of appeals was concerned that the jury, after hearing evidence of another heinous sexual assault of a young child, would decide to punish the defendant based on that fact alone rather than the facts comprising the current charges. *See id.; see also Fishnick,* 127 Wis. 2d at 261–62 (citing *Tarrell,* 74 Wis. 2d at 657).

¶ 92. In the present case, the circuit court was fully engaged in the issues surrounding the admissibil-

---

[19] The other acts evidence included the allegation that the defendant forced his cousin "to perform oral sex on him and [he] urinated in her mouth." *State v. McGowan,* 2006 WI App 80, ¶ 9, 291 Wis. 2d 212, 715 N.W.2d 631.

ity of the other acts evidence. It had presided over the defendant's first trial, and it listened to the well-made respective arguments. Although the court determined that the probative value of the evidence was not substantially outweighed by its prejudicial effect when it admitted the evidence, it did not make express findings to this effect. In these circumstances, an appellate court should independently review the record "to determine whether there is any reasonable basis for the trial court's discretionary decision." *Davidson,* 236 Wis. 2d 537, ¶ 53 (citing *Sullivan,* 216 Wis. 2d at 781); *State v. Gray,* 225 Wis. 2d 39, 51, 590 N.W.2d 918 (1999). We conclude that there is.

¶ 93. There is no denying that the other acts evidence regarding a gun and a large amount of cocaine being present at Payano's apartment the day before the shooting may have caused the "the jury [to] draw the forbidden propensity [or character] inference." Blinka, *supra,* § 404.6 at 185. It is certainly plausible that some members of the jury may have decided to convict Payano based on "improper means" upon hearing the other acts evidence. *See Sullivan,* 216 Wis. 2d at 789–90; *Johnson,* 184 Wis. 2d at 340 (citing *Christensen,* 77 Wis. 2d at 61).

¶ 94. Having said that, this is not a classic case of unfair prejudice, like *McGowan,* where the other acts evidence is so similar in nature to the charged act that there is danger the jury will simply presume the defendant's guilt in the current case. *See McGowan,* 291 Wis. 2d 212, ¶¶ 1–2, 9–10, 23. Moreover, the danger of unfair prejudice is not as great as it would be if the other acts evidence were used to prove Payano's identity or that he committed the charged offense. *Cf. Whitty,* 34 Wis. 2d at 294 ("[T]he standards of relevancy should be

stricter when prior-crime [or other acts] evidence is used to prove identity or the doing of the act charged than when the evidence is offered on the issue of knowledge, intent or other state of mind. McCormick, Evidence (hornbook series), p. 331, sec. 157."). Although we cannot say that the other acts evidence presented no danger of unfair prejudice to Payano, the danger was not exceptionally high given the nature of the evidence compared with the nature of the charged offense.

¶ 95. Instead, similar to the other acts evidence offered in *Pharr* and *Johnson,* the evidence offered by the State in this case is *directly linked* and *necessary* to the determination of Payano's guilt. *See Pharr,* 115 Wis. 2d at 348–49; *Johnson,* 184 Wis. 2d at 338–41. Kojis's testimony and the information he provided Officer Lutz of what he saw the day before the shooting in Payano's apartment was the foundation upon which the State's case rested. Using the words of the Pharr court, *"the [S]tate needed to introduce [the] evidence." Pharr,* 115 Wis. 2d at 348 (emphasis added). The evidence offered a plausible explanation as to why Payano might have shot his gun knowing that it was the police at the apartment door. *See Johnson,* 184 Wis. 2d at 340. Without that evidence, it was not possible for the State to connect the shooting with its theory of why the shooting took place. *See id.* at 339 ("[T]he . . . evidence was highly probative to [the defendant]'s theory of defense."); *see also Kourtidias,* 206 Wis. 2d at 582 ("[T]his other acts evidence was very relevant to this theory of defense."). Without that connection, the State's case would have lacked credibility because it would have been supported only by the State's bald assertion that Payano must have shot at the officer to buy time to hide or destroy drugs. Therefore, the other acts evidence in

this case is extremely probative because the resolution of "this case essentially turned on the jury's assessment of . . . credibility" between the State's theory and Payano's theory. *Johnson,* 184 Wis. 2d at 340.

¶ 96. The other acts evidence offered by the State presented "an alternative explanation of [Payano]'s involvement [in the] shooting[, which became evident only] when the entire course of conduct [wa]s reviewed." *Pharr,* 115 Wis. 2d at 348. In other words, "the evidence was highly probative to [Payano]'s theory of defense." *Johnson,* 184 Wis. 2d at 339; *see also Kourtidias,* 206 Wis. 2d at 582 ("[T]his other acts evidence was very relevant to this theory of defense."). Consequently, because the other acts evidence was absolutely essential to the State's case, its probative value was compelling. *See Johnson,* 184 Wis. 2d at 339–41; *see also Pharr,* 115 Wis. 2d at 348–49; Blinka, *supra,* § 404.6 at 183.

¶ 97. Weighing the high degree of probative value against the danger of unfair prejudice, we cannot say that the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice. *See* Wis. Stat. § 904.03; *Sullivan,* 216 Wis. 2d at 772–73, 789; *Davidson,* 236 Wis. 2d 537, ¶ 35; Blinka, *supra,* § 404.6 at 170, 183–88. In our view, the probative value of the evidence substantially outweighs the danger of unfair prejudice. Therefore, the circuit court's decision to admit the other acts evidence was not erroneous. It was *not* a decision "that no reasonable judge, acting on the same facts and underlying law, could reach." *See Jeske,* 197 Wis. 2d at 913.

¶ 98. In considering the State's motion to admit the other acts evidence, the court was told by defense counsel that the defendant would not "contest and dispute the search warrant." A defendant is likely to be prejudiced by the fact that a jury will be told that a

court has issued a no-knock warrant authorizing police to break down a defendant's door. A jury is likely to speculate on the basis for that warrant. Providing the jury with the information about that basis for the warrant may be more harmful to the defendant than speculation, but the inevitable harm is a matter of degree. Not advising the jury about the warrant would mislead and confuse the jury.

¶ 99. If evidence does carry the danger of unfair prejudice, the circuit court can mitigate that danger and lessen the unfair prejudicial effect by utilizing any of the following: (1) "stipulations"; (2) "editing the evidence"; (3) "limiting instructions"; and (4) "restricting argument." Blinka, *supra,* § 404.6 at 186; *see also id.,* § 106.1 at 46 ("Limited admissibility is enforced through two procedural means, namely, restrictions on arguments and jury instructions."). In fact, precedent suggests that cautionary jury instructions can go a long way in limiting the unfair prejudice that may result from the admission of other acts evidence.[20]

---

[20] *See Hunt,* 263 Wis. 2d 1, ¶¶ 72–73 ("[C]autionary instructions help to limit any unfair prejudice that might otherwise result. . . . [T]he circuit court offered proper cautionary instructions on the other-acts evidence. Accordingly, any unfair prejudicial effect caused by the admittance of the other-acts evidence was substantially mitigated by the circuit court's cautionary instructions . . . ." (citing *Plymesser,* 172 Wis. 2d at 596–97)); *Sullivan,* 216 Wis. 2d at 791 ("[A] cautionary instruction, even if not tailored to the case, can go far to cure any adverse effect attendant with the admission of the [other acts] evidence.") (internal quotations and citations omitted) (second alteration in original); *Shillcutt,* 116 Wis. 2d at 238 ("[T]he cautionary instruction read to the jury prior to introduction of [other acts] testimony sufficiently tempered the prejudicial effect of this evidence so as to allow its admissibility. If an admonitory instruction is properly given by the court, prejudice

¶ 100. Although cautionary jury instructions are preferred[21] and should normally be provided when admitting other acts evidence, they are not required unless requested.[22] *See* Wis. Stat. § 901.06 ("When

to a defendant is presumed erased from the jury's mind."); *see also* Blinka, *supra*, § 404.6 at 186–87.

[21] We set forth note 1 from Criminal Jury Instruction 275 in its entirety as a reminder to counsel and to the courts the best course of action for dealing with cautionary instructions for other acts evidence.

> Whenever evidence has been admitted for a limited purpose, § 901.06 provides that a cautionary instruction must be given upon request.
>
> The Wisconsin Supreme Court has held that the trial judge is under no obligation to give a cautionary instruction in the absence of a request by the defendant. *Hough v. State,* 70 Wis. 2d 807, 817, 235 N.W.2d 534 (1975). The basis for the decision in *Hough* was a recognition that it may have been a tactical decision by the defense not to request an instruction, out of a desire not to call further attention to the prior act. However, the absence of a curative or limiting instruction has been considered by the court in finding that admission of other acts evidence constituted reversible error. *State v. Spraggin,* 77 Wis. 2d 89, 101, 252 N.W.2d 94 (1977). *It may be desirable, therefore, for the trial judge to inquire of the defense whether a cautionary instruction is requested and, if the defendant's tactical decision is not to request the instruction, to make a record of that decision.* The trial judge may also wish to consider giving the instruction, or a variation thereof, at the time the other acts evidence is admitted in addition to the instruction given at the close of the case.

Wis JI—Criminal 275 at 3 (emphasis added).

[22] We do recognize that in some cases the defendant or the defendant's counsel may not want the cautionary instruction given "because such instructions often just underscore the forbidden purpose" the defendant wishes to avoid. Blinka, *supra*, § 106.1 at 46–47; *see also Hough,* 70 Wis. 2d at 817.

> The problem for this court when no such request for instruction is made is to determine, from the record, whether it may have

411

evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, *the judge, upon request, shall restrict the evidence* to its proper scope and instruct the jury accordingly.")[23] (emphasis added); Wis JI—Criminal 275 at 3 ("[T]he trial judge is under *no obligation to give a cautionary instruction in the absence of a request* by the defendant." (citing *Hough v. State,* 70 Wis. 2d 807, 817, 235 N.W.2d 534 (1975))) (emphasis added); Blinka, § 404.6 at 186 ("Other act evidence normally *should* be accompanied by an admonitory or limiting instruction precisely because the evidence is being introduced for only a limited purpose.") (emphasis added). However, the absence of a cautionary instruction can be considered in weighing the evidence's danger of unfair prejudice against its probative value. Wis JI—Criminal 275 at 3 ("[T]he absence of a curative or limiting instruction has been considered by the court in finding that admission of other acts evidence constituted reversible error." (citing *Spraggin,* 77 Wis. 2d at 101)); *cf. Sullivan,* 216 Wis. 2d at 791 (finding an overbroad cautionary instruction ineffective in mitigating the danger of unfair prejudice).

¶ 101. Regardless of whether a cautionary instruction is provided to the jury, "counsel may only

been a trial tactic on the part of the defense not to ask for such an instruction, out of a desire, for example, not to call further attention to the prior act. This court has consistently held that no sua sponte instruction need be given under circumstances where failure of a defendant to request an instruction may reasonably be part of a trial tactic, recently in the case of *Watson v. State* (1974), 64 Wis. 2d 264, 219 N.W.2d 398.

[23] "Contrary to the suggestion in the Judicial Council Committee's Note to Wis. Stat. § 901.06, an instruction is not mandatory unless the opponent requests that it be given." Blinka, *supra,* § 106.1 at 47 n.12.

argue the evidence for its proper purpose, as delimited by the trial judge's ruling." Blinka, *supra*, § 106.1 at 47. Otherwise, as in *Sullivan,* the court may find that the probative value of the other acts evidence is substantially outweighed by its danger of unfair prejudice. *Sullivan,* 216 Wis. 2d at 791–92 ("[T]he prosecutor referred to the other acts evidence extensively in both the opening and closing statements and urged the jury to consider what the evidence revealed about the defendant's character.").

¶ 102. In the present case, the circuit court judge did not provide the jury with a cautionary instruction.[24] However, she did firmly admonish the attorneys to limit their arguments regarding the other acts evidence to the purposes delineated by the prosecution. The court stated the following:

> *The State will not be allowed to suggest that Mr. Payano is a drug dealer. I think Mr. Kojis should clearly testify that he didn't go there looking for drugs, that neither he nor his friend bought drugs, that there was no drug transaction going on.*

> . . . .

> But I do think that the context and the testimony of this witness is something that the jury should hear for a *very narrow point.*

(Emphasis added.)

¶ 103. The court limited the use of the evidence to "a very narrow point"—namely, as proof that Payano shot the gun, knowing that the police were at the door, so that he could get rid of drugs—and there is no suggestion that the evidence was used for any reason

---

[24] According to the record, neither party requested an instruction.

beyond that "very narrow point." In fact, the court of appeals makes mention in two different paragraphs of its opinion that the State did not use the evidence for any improper purpose. *See Payano,* 312 Wis. 2d 224, ¶¶ 31, 35 ("[T]he prosecutor complied with the trial court's restriction . . . .").

■

¶ 104. Although the lack of a cautionary instruction may be the deciding factor in some cases of whether the evidence is admissible under Wis. Stat. § 904.03, *see* Wis JI—Criminal 275 at 3, that is not the situation here because the probative value of the evidence far outweighed its danger of unfair prejudice, with or without a limiting instruction, *see supra,* ¶¶ 93–98.

## IV. CONCLUSION

¶ 105. After carefully considering the facts and circumstances, we conclude that the circuit court did not err in admitting the "other acts" testimony of a confidential informant about his observations of the defendant's possession of drugs and a handgun in the defendant's apartment on the day before the police executed a no-knock search warrant at the apartment. The informant's testimony provided context for an incident in which a police officer was shot by the defendant. It explained why the police were at the defendant's apartment, and it provided a plausible explanation of why the defendant fired his gun at a police officer trying to enter the apartment. The informant's testimony served to rebut the defendant's claim that he was acting reasonably in defense of himself and his family. It provided a motive for the shooting.

¶ 106. The circuit court determined that (1) evidence of the defendant's very recent involvement with drugs and a gun at the place where the shooting

occurred was offered for a proper purpose under Wis. Stat. § 904.04(2); (2) the evidence was relevant under Wis. Stat. § 904.01; and (3) the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice under Wis. Stat. § 904.03. The circuit court did not erroneously exercise its discretion because it reviewed the relevant facts, applied a proper standard of law, and using a rational process, reached a reasonable conclusion. We believe the circuit court offered a cogent explanation for admitting the evidence in the circumstances presented.

¶ 107. Because of our decision on the first issue posed by the State, we find it unnecessary to address the second issue.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 108. ANN WALSH BRADLEY, J. (*dissenting*). Without even laying eyes on a piece of evidence that the prosecutor referred to as "the heart of this case," the majority purports to balance the probative value of Kojis' other acts testimony and its prejudicial effect.

¶ 109. I refer to a tape of the 911 call Payano placed after he fired the shot that injured the officer and before he was apprehended in his bathroom. It is difficult to imagine a piece of evidence more probative of Payano's mental state than an audio recording of that call. Yet, where is the tape? What was said during that call? The majority notes that the tape is not in the record and it moves on, untroubled.[1]

¶ 110. Balancing probative value and prejudicial effect is an extremely fact-specific process. Yet, here, the majority engages in a balance without weighing essen-

---

[1] A transcript of the tape was marked as an exhibit. It, too, is missing from the appellate record.

415

tial evidence that was repeatedly played to the jury and permeated the testimony in various phases of the trial. At a minimum, the court should supplement the record with the 911 tape before conducting this balance.

¶ 111. If this tape is unavailable, however, and I were required to evaluate an incomplete record, I would agree with a unanimous court of appeals that the circuit court erroneously exercised its discretion when it admitted Kojis' testimony. "[T]he probative value of Kojis' testimony, if any, is negligible" and if believed, it could readily provoke the jury to punish Payano due to a perception that he was a drug dealer rather than for the crime charged. *State v. Payano*, 2008 WI App 74, ¶¶ 28, 30, 312 Wis. 2d 224, 752 N.W.2d 378. Accordingly, I respectfully dissent.

I

¶ 112. The issue for us upon review is whether the circuit court erred in admitting other acts evidence of Payano's drug activity that occurred the day before he fired the shot. The majority concludes that the evidence is relevant to provide context and to rebut Payano's theory of self defense. After conducting a balancing test, the majority determines that the evidence was properly admitted because the probative value of the evidence outweighed the danger of unfair prejudice.

¶ 113. There was no question at trial that Payano shot a police officer. Rather, the essential issue that the jury was required to decide was what Payano believed at the time of the shooting. Did he knowingly shoot at the officer behind the door in order to buy time and destroy evidence? Or did he shoot at the door to protect himself and his family, believing that the people behind the door were trying to hurt him?

¶ 114. The tape from Payano's 911 call was entered into evidence during both trials and repeatedly played to the jury. Both the defense and the prosecutor attempted to use the tape to bolster their arguments about Payano's claim of self-defense. Nevertheless, the tape is not part of the record on appeal. *See* majority op., ¶ 17 n.4.

¶ 115. Certainly, Payano's own words during that phone call would have been extremely probative of his belief at the time. During his closing arguments, the prosecutor stated: "The best thing that the defense has going for it clearly is the 911 tape, and that's why it's played over and over. I don't blame them."

¶ 116. Defense counsel argued that the tape demonstrated that Payano thought that he had shot at someone who was breaking in to kill him rather than a police officer. In his opening statement, he said: "And the State will have you believe that this person, Tony Payano, who called 911 is the same person who intentionally fired upon a police officer. So I ask you to ask yourselves is that behavior consistent with somebody who believes they have just committed a crime?"

¶ 117. During closing arguments, defense counsel argued: "Seconds after that chaotic scene [when Payano shot at the door], Tony Payano made that call, in a matter of seconds . . . . And you can hear Tony, somebody shooting, somebody shooting, and [his mother] screaming, she's in the background, oh, my God, over and over. . . . [A]nd most important here, why is a guy who knows he fired against a cop, why would his first instinct be to call 911? Is that the conduct of somebody who knows that they fired on a cop? No, of course not. That is the conduct of somebody who is acting to

417

protect his mother and his cousin and himself from people breaking down his door, when he thought they were going to kill him."

¶ 118. The prosecutor asserted that Payano made the call in order to falsely create evidence of his innocence: "Now I don't know for sure whether or not Tony Payano deserves an Academy Award for his performance on that day, but . . . unlike every other piece of evidence in this case, that piece of evidence was created by the defendant who is on trial[.]"

¶ 119. Balancing probative value and prejudicial effect is an extremely fact-intensive inquiry. Yet, the majority attempts to perform the balance without reviewing the most important piece of evidence in the record. Rather than performing the balance in a vacuum, the majority should supplement the record with the evidence that is at "the heart of this case"—the 911 tape.

## II

¶ 120. On this record, however, the majority concludes that the other acts evidence was properly admitted. Kojis, a paid informant, testified at trial that the day before the arrest, he walked into Payano's kitchen and saw him "bagging up cocaine." According to Kojis, who said he was familiar with the sale of cocaine because he "grew up in that environment," this was no small amount of cocaine for personal use. Rather, it was "a bunch of bagged packages of cocaine along with large chunks."

¶ 121. He testified that he was familiar with the "packaging that people in the City and County of Milwaukee use for cocaine" and explained to the jury how cocaine is bagged, the terminology used, and the

quantities in which it is sold. It was Kojis' opinion that Payano had a "relatively large amount."

¶ 122. After testifying about the presence of the drugs, Kojis turned his attention to the gun which he observed on the kitchen table next to Payano. He told the jury that he had "experience around pistols" and that this gun was a "semi automatic." After further questioning, he identified it as a "380," whereupon the prosecutor displayed to the jury either the gun or a picture of the gun and asked several more questions about it.

¶ 123. The State argued, and the majority agrees, that the evidence was relevant to show context—that the officers were legitimately at the door in the first place. The circuit court accepted this rationale: "The jury [in the first trial], I believe was left with the impression that this search warrant was somehow arbitrary, based on nothing, that the police came storming in a place with no basis really for doing that, that it may have been somehow a violation of Mr. Payano's rights . . . ."

¶ 124. The problem with the context argument is that it is used to admit evidence that is not relevant to the elements of the charged offense. The circuit court accepted the context argument to admit evidence to defend the actions of the police officers rather than evidence relevant to Payano's actions. As the court of appeals noted, "[t]his case does not center on the police officers' conduct in executing the no-knock search warrant" and the circuit court's rationale "is not pertinent to our relevancy determination." *Payano,* 312 Wis. 2d 224, ¶ 25.

¶ 125. The State also argued, and the majority agrees, that the evidence was relevant to rebut Payano's claim of self defense because it would show that Payano

would be more likely to expect police officers at his door. Like the court of appeals, I am not persuaded that Kojis' testimony about the presence of cocaine and a gun at Payano's residence supports the inference that Payano would reasonably have known that it was the police at his door.

¶ 126. Instead, I agree that "the alleged presence of cocaine at his residence the day before the shooting no more supports the proposition that he thus believed that the men attempting to break down his door were police, than it does the notion that Payano believed they were hoodlums seeking to harm him, his mother, and his cousin, and steal the cocaine." *Id.*, ¶ 24.

¶ 127. The probative value of evidence largely depends on the degree of its relevance. *See* Daniel D. Blinka, *Wisconsin Practice Series: Wisconsin Evidence* § 404.6, at 183 (3d ed. 2008). The other acts evidence here is probative of little if anything other than Payano's character as a drug dealing criminal and the inference that he will behave accordingly. Ultimately, like the court of appeals, I conclude that the probative value of Kojis' testimony is negligible, if at all.

¶ 128. On the other hand, testimony tending to show that Payano was a drug dealer presents the classic danger of unfair prejudice. Notably, no cocaine, cocaine residue, or drug paraphernalia was found at Payano's residence, and Payano was not charged with any drug-related crime. Yet, Kojis' testimony clearly left the impression that Payano was a dangerous drug dealer.

¶ 129. Compounding the prejudice here is that the circuit court failed to give a limiting instruction, even though it had earlier explained that it intended to give such an instruction in order to reduce the danger of unfair prejudice. *See* majority op., ¶ 34, n.6. Thus, the jury was not instructed about the limited legal purpose

for which the other acts evidence was admitted. This left the jury unguided and free to draw legally impermissible inferences from the other acts evidence. I conclude that Kojis' testimony had a tendency to influence the outcome of the trial by improper means by arousing the jury's sense of horror and provoking its instinct to punish or otherwise base its decision on something other than the crime charged. *See State v. Sullivan,* 216 Wis. 2d 768, 789–90, 576 N.W.2d 30 (1998).

¶ 130. Here, the balance is clear. As discussed above, the probative value of the evidence was negligible—if at all. By contrast, the danger of unfair prejudice was extremely high. Like the court of appeals, I conclude that the probative value was far outweighed by the danger of unfair prejudice.

¶ 131. For the reasons discussed above, I respectfully dissent.

¶ 132. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.